United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 31, 2005**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 04-70030
_____

PEDRO SOLIS SOSA,

Petitioner-Appellant,

v.

DOUGLAS DRETKE, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC NO. 5:00-CV-312

_____

Before WIENER, BENAVIDES, and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:[*]

Petitioner Pedro Solis Sosa ("Sosa" or "Petitioner") was

convicted of capital murder in Texas state court and sentenced to

death.  Sosa filed a petition for a writ of habeas corpus in the

United States District Court for the Western District of Texas

pursuant to 28 U.S.C. § 2254.  The district court denied the

petition and also denied Petitioner a Certificate of

Appealability ("COA").[1]  Petitioner now requests a COA from this

---

[*]     Pursuant to 5TH CIR. R. 47.5, the Court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

[1]  *Sosa v. Dretke*, 2004 WL 1124949 (W.D. Tex.).

Court pursuant to 28 U.S.C. § 2253(c). For the following reasons, Petitioner's Application for a Certificate of Appealability from Denial of a Petition for Writ of Habeas Corpus is denied.

## I. BACKGROUND

During the morning of November 4, 1983, Petitioner, who was then 31-years-old, and his then 17-year-old accomplice Leroy Sosa, flashed the lights of their vehicle to flag down Wilson County Deputy Sheriff Ollie "Sammy" Childress while they were driving on a rural road in Wilson County, Texas. When Deputy Childress stopped his car, Petitioner pointed a handgun at him and told him to move to the passenger seat of his patrol vehicle. Petitioner then drove Deputy Childress' vehicle to a dirt road where he directed Deputy Childress to exit his vehicle, remove his shirt, place himself in his own handcuffs, and climb into the trunk of his patrol car. Petitioner and Leroy Sosa then drove the patrol vehicle to the LaVernia State Bank where they robbed the bank and unsuccessfully attempted to take two women as hostages. After robbing the bank, Petitioner and Leroy Sosa drove back to the isolated location where they had parked their vehicle. Petitioner then opened the trunk of the patrol car and shot Deputy Childress in the neck and head from close range because Deputy Childress had seen Petitioner's face. After Petitioner and Leroy Sosa had driven a short distance away,

2

Petitioner directed Leroy Sosa to return to the patrol car so that they could wipe off the trunk of that vehicle.  When they returned, Petitioner saw that Deputy Childress was still moving, so he again shot him in the neck and head from close range.

Soon after police arrested Petitioner on February 3, 1984, he signed a written confession admitting his guilt.  Leroy Sosa also signed a written confession soon after his arrest on December 19, 1983, which was consistent with the key elements of Petitioner's confession.  Additionally, Leroy Sosa testified at Petitioner's trial that Petitioner shot Deputy Childress.

A jury found Petitioner guilty of capital murder on November 27, 1984.  The next day, the jury answered both of the Texas capital sentencing special issues affirmatively and the state trial judge sentenced Petitioner to death by lethal injection.

After Petitioner was convicted of this crime and his sentence was imposed, the Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal on February 15, 1989.  Petitioner did not seek certiorari in the Supreme Court of the United States.

Petitioner subsequently filed his first state application for a writ of habeas corpus on May 17, 1993.  Petitioner filed two supplemental state habeas applications, on October 29, 1993 and on November 8, 1993.

Petitioner also filed a motion to recuse the state trial judge who had presided over Petitioner's capital murder trial.

3

That motion was denied on November 8, 1993 following a hearing presided over by a different judge.

The state trial court then held an evidentiary hearing from November 8-12, 1993. The court heard evidence from investigators, witnesses and lawyers involved in the prosecution of Petitioner. On November 7, 1994, the state trial court issued an Order recommending that Petitioner's request for state habeas corpus relief be denied.

In a one-page unpublished per curiam Order issued May 30, 1995, the Texas Court of Criminal Appeals denied Petitioner's state habeas corpus application.[2]

On November 17, 1995, Petitioner filed his first petition for federal habeas corpus relief. On December 20, 1995, Petitioner filed his first amended federal habeas corpus petition. Subsequently, the federal district court allowed Petitioner to engage in lengthy and extensive discovery, including requests for information pursuant to the Freedom of Information Act.

After obtaining new information during this lengthy discovery period, Petitioner filed his second amended federal habeas corpus petition on November 30, 1998. This petition was accompanied by several thousand pages of deposition transcripts and other documents theretofore never presented to any state

---

[2] *See Ex Parte Pedro Solis Sosa*, Writ No. 24,852-01 (Tex. Crim. App. May 30, 1995).

court.  On March 11, 1999, the federal district court dismissed Petitioner's second amended petition without prejudice for failure to exhaust available state remedies with regard to his newly discovered evidence.  This Court affirmed the dismissal in an unpublished opinion issued September 27, 1999.

Petitioner then filed his second application for state habeas corpus relief on or about October 14, 1999.  On November 10, 1999, the Texas Court of Criminal Appeals dismissed Petitioner's second state habeas corpus application pursuant to the Texas writ-abuse statute.[3]

On April 21, 2000, Petitioner again filed a federal habeas corpus petition.  On May 12, 2000, Petitioner filed his amended petition for federal habeas corpus relief.

On May 20, 2004, the federal district court denied Petitioner's federal habeas corpus petition, and also denied Petitioner a COA.  Petitioner now appeals the district court's denial of a COA.

Petitioner alleges ten grounds for relief on the following bases: (1) his confession was involuntary; (2) *Brady*[4] evidence was withheld by the prosecutor; (3) the State did not produce statements of witnesses; (4) and (5) the State set retaliatory execution dates for Petitioner in violation of the Eighth and

---

[3] *See Ex Parte Pedro Solis Sosa*, App. No. 24,852-02 (Tex. Crim. App. Nov, 10, 1999).

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

5

Fourteenth Amendments and the International Covenant on Civil and Political Rights; (6) ineffective assistance of counsel; (7) the State withheld evidence that could have impeached the testimony of Petitioner's accomplice; (8) and (9) Petitioner was denied adequate representation of Hispanics and women on his grand and petit juries; and (10) cumulation of error in grounds 1-3 and 6-9 warrant a new trial.

## II.   STANDARD FOR GRANTING A COA

Petitioner contends that the federal courts should review his habeas claims using a *de novo* standard of review.  He argues that his current federal petition should be treated as a continuation of his first federal petition, which he filed prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  We rejected this argument in *Graham v. Johnson*, 168 F.3d 762, 775-87 (5th Cir. 1999).  The more restrictive standard of federal habeas review set forth in AEDPA applies to a federal habeas corpus petition filed after the effective date of AEDPA, even when a petitioner had filed a federal habeas petition which was dismissed without prejudice for failure to exhaust state remedies prior to the effective date of AEDPA.  *Id*.  Therefore, AEDPA applies to Petitioner's current federal habeas petition.[5]

---

[5] Although we decide this case using the more restrictive AEDPA standard of review, we note that we would also find that reasonable jurists could not disagree with the district court's conclusion that Petitioner's claims have no merit even with a *de novo* review.  Therefore, even if we were to apply the

Under AEDPA, a petitioner must obtain a COA before he can appeal the district court's denial of habeas relief. *See* 28 U.S.C.A. § 2253(c); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners.").

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it.

*Miller-El*, 537 U.S. at 336.

A COA will be granted if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id*. at 342. "Indeed, a claim can be debatable even though every jurist

---

more lenient pre-AEDPA standard of review, we would still deny Petitioner's request for a COA.

of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id*. at 338. "Because the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

Additionally, in reviewing the district court's assessment, this Court must be mindful of the deferential standard of review of 28 U.S.C. § 2254(d). Under § 2254(d), a federal court cannot grant habeas corpus relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States,[6] or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). With respect to the review of factual findings, AEDPA significantly restricts the scope of federal

---

[6] A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).
A state court's decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. An unreasonable application is different from a merely incorrect one. *Id*. at 410-11.

habeas review.  Factual findings are presumed to be correct, and a petitioner has the burden of rebutting this presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

When we apply AEDPA to Petitioner's claims at the COA stage, "we only ask whether the District Court's application of AEDPA deference, as stated in §§ 2254(d)(2) and (e)(1)," to Petitioner's claims "was debatable amongst jurists of reason." *Miller-El*, 537 U.S. at 341.

### III. DISCUSSION

A.    Involuntary Confession Claim

Petitioner contends in his first claim for relief that the admission of his written confession was improper because his confession was coerced, in violation of his due process rights. Specifically, Petitioner contends that, in light of his illiteracy, mental illness and retardation, law enforcement officials coerced him by arresting his wife, holding him incommunicado and interrogating him overnight, and by furnishing him with information about the offense in order to ensure that Petitioner's and Leroy Sosa's statements were consistent.

In order to determine whether a confession was obtained in violation of a defendant's due process rights, "courts look to the totality of circumstances to determine whether a confession was voluntary." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). The potential circumstances include "the crucial element of

9

police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Id*. (citations omitted).

The Supreme Court has recognized that the mental condition of the defendant is a factor in the "voluntariness" calculus. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). However, "a defendant's mental condition, by itself and apart from its relation to official coercion" will not dispose of the inquiry into constitutional "voluntariness." *Id*.

The district court found that Petitioner did not offer any evidence at the *Jackson v. Denno*[7] hearing held May 18, 1984 suggesting that any promises or threats had ever been made which actually induced Petitioner's confession. Petitioner also failed to introduce any evidence regarding (1) threatening or menacing treatment of his wife, (2) his ability to read or understand his written statement, (3) his mental impairment at the time he gave his confession, (4) his impression that his wife had been charged or would be charged with any crime relating to the bank robbery or murder, or (5) police "feeding" him information during his post-arrest interview relating to either the robbery or murder of which Petitioner claims to have lacked pre-existing personal knowledge.

Law enforcement officers did, however, testify that (1)

---

[7] 378 U.S. 368 (1964).

10

Petitioner was orally given his *Miranda*[8] warnings both immediately after his arrest and again immediately prior to the start of his custodial interrogation, (2) Petitioner indicated he understood his rights and he wished to answer questions concerning the bank robbery and murder, (3) no promises or threats were ever made to induce Petitioner's confession, and (4) Petitioner read over his written confession, had it read to him, and made initialed changes before signing it. Furthermore, the top of the first page of Petitioner's written statement contains a written recitation of Petitioner's constitutional rights.

The district court found that Petitioner does not identify any evidence in the record supporting a conclusion that there was any coercion directed toward him which actually led to his confession. Petitioner's submissive personality, limited command of the English language and mental impairment are a part of the "voluntariness" calculus. *See Connelly*, 479 U.S. at 164. However, Petitioner must still demonstrate that official coercion took place, and that the coercive police conduct was causally related to the confession in order to prove a constitutional violation. *Id*. at 166-67. Petitioner did not offer any evidence to show that any of the allegedly coercive law enforcement tactics had any impact whatsoever upon his decision to give his post-arrest confession.

---

[8] 384 U.S. 436 (1966).

Petitioner also did not make any specific factual allegations, much less present any evidence, that he did not comprehend his *Miranda* warnings or that his waiver of his constitutional right to remain silent and his ensuing confession were anything other than voluntary.

Under such circumstances, reasonable jurists could not debate the correctness of the district court's conclusion that Petitioner's first claim is without merit, nor could jurists conclude that this claim deserves encouragement to proceed further. Accordingly, we decline to issue a COA on this claim.

B.  *Brady* Claims

In his second, third and seventh claims for relief, Petitioner contends that the prosecution withheld "voluminous" *Brady* material that was crucial to his defense. Specifically, Petitioner identifies the following allegedly exculpatory material: (1) FBI reports summarizing descriptions of the bank robbers given by eyewitnesses shortly after the robbery that placed Petitioner in a subordinate role; (2) the results of polygraph examinations of other suspects that indicated deception by those suspects; (3) the fact that over sixty fingerprints were lifted from the bank and others from the putative getaway car, and none of them matched either Petitioner or Leroy Sosa; (4) the fact that the persons who initially implicated Petitioner in the offense were paid by the government and that they were a suspect

12

and his girlfriend; (5) the results of the hypnosis sessions of witnesses; (6) the statements of trial witnesses; (7) information regarding Leroy Sosa's history of drug and alcohol abuse; and (8) the cumulative effect of this evidence.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The prosecution's duty under *Brady* to disclose material evidence applies even when there has been no request from the accused. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Kyles v. Whitney*, 514 U.S. 419, 433 (1995). The duty also applies to impeachment evidence, and to evidence known only to police investigators and not to the prosecutor. *Kyles*, 514 U.S. at 437.

There are three elements to a *Brady* prosecutorial misconduct claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material, *i.e.*, prejudice must have ensued from its non-disclosure. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281-82. Evidence is material under *Brady* where there exists a

"reasonable probability" that had the evidence been disclosed the result at trial would have been different. *See Banks*, 540 U.S. at 698-99. A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Kyles*, 514 U.S. at 434 (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry: first, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal;[9] second, the materiality inquiry is not a sufficiency of the evidence test;[10] third, once materiality is established, harmless error analysis has no application;[11] and fourth, materiality must be assessed collectively, not item by item.[12]

Petitioner has failed to show a *Brady* violation with respect to any of the evidence the State allegedly suppressed. Examining each of Petitioner's *Brady* claims in turn, the district court found: (1) whether Petitioner was in a subordinate role in the bank robbery is irrelevant because Petitioner was convicted of capital murder for killing a law enforcement officer in the

---

[9] *See Strickler*, 527 U.S. at 289-90; *Kyles*, 514 U.S. at 434-35.

[10] *See Kyles*, 514 U.S. at 434-35.

[11] *See Id.*, 514 U.S. at 435-36.

[12] *See Id.*, 514 U.S. at 436-37.

14

performance of his official duties, not for his role in the bank robbery;[13] (2) the polygraph evidence suggests that other individuals used the getaway car on the day of the robbery, but it is not exculpatory because Petitioner and Leroy Sosa admitted that they were back in San Antonio by that afternoon; (3) the fact that there were many fingerprints lifted from the bank and the putative getaway car that did not match those of Petitioner or Leroy Sosa is not exculpatory evidence; it merely shows that others were present in a public location and that others had been in the car at some point in time; (4) Petitioner made no fact-specific allegations, much less presented any evidence, establishing that there has ever existed any evidence showing that the suspect in question, Manuel Villanueva, had any involvement in the murder of Deputy Childress; (5) of the three individuals who were hypnotized during the investigation, only one testified at trial[14] and the portion of his testimony that arose from the hypnosis session was completely immaterial for *Brady* purposes;[15] (6) aside from the summary of Charles Esparza's

---

[13] For the same reason, the district court found that impeaching the bank eyewitnesses would have had no value in terms of refuting the clear evidence of both the identity of the person who shot Deputy Childress and the reason Petitioner shot Deputy Childress furnished by Petitioner's confession and Leroy Sosa's trial testimony.

[14] The district court found that the other two individuals who were hypnotized during the investigation were unable to divulge any new or additional information while under hypnosis that they had not furnished law enforcement officers prior to being placed under hypnosis.

[15] More specifically, the witness, Charles Esparza, was one of several witnesses at Petitioner's trial who testified that he had observed a yellow vehicle on November 4, 1983 in the vicinity of LaVernia traveling close behind

statements made while under hypnosis which the district court found to be immaterial for *Brady* purposes,[16] Petitioner offered no evidence showing that the witnesses identified by Petitioner ever executed a written statement for any investigating authority that was withheld from Petitioner's trial counsel; and (7) Petitioner failed to demonstrate that any law enforcement agency actually knew about Leroy Sosa's purported long-term drug and alcohol abuse at the time of Petitioner's trial, so by definition the prosecution could not have "withheld" or "suppressed" such information.[17]

The district court then examined the cumulative effect of the non-disclosure of all of the evidence that was allegedly withheld from Petitioner at trial. With respect to the guilt-innocence phase of the trial, the district court found that none of the evidence Petitioner contends the prosecution withheld or

---

a deputy sheriff's vehicle. Mr. Esparza provided investigators with this information prior to his hypnosis session. While under hypnosis, Mr. Esparza "remembered" a license plate number that proved to be completely irrelevant and erroneous, and he "remembered" that the rear license plate was hanging down. It has never been established whether the rear license plate of Petitioner's car was actually hanging down. Even if Petitioner had been able to impeach Mr. Esparza in some way with this evidence, Mr. Esparza was only one of four trial witnesses who placed a yellow vehicle in close proximity to a deputy sheriff's car near LaVernia on November 4, 1983.

[16] *See* note 15, *supra*.

[17] Additionally, the district court noted that Leroy Sosa's written confession was never admitted into evidence at Petitioner's trial, so any evidence showing that Leroy Sosa was suffering from drug or alcohol withdrawal at the time he gave his confession was not material within the meaning of *Brady*. Moreover, Petitioner presented no evidence showing that Leroy Sosa was suffering from the effects of drug or alcohol withdrawal when he testified at Petitioner's trial.

suppressed would have reduced the inculpatory impact of either Petitioner's confession or Leroy Sosa's trial testimony establishing that Petitioner twice shot Deputy Childress, both of which established Petitioner's guilt beyond any doubt. None of the purported *Brady* evidence casts any doubt on the veracity of either Petitioner's confession or the portion of Leroy Sosa's trial testimony in which he identified Petitioner as the person who fatally shot Deputy Childress, so there is no reasonable probability that with its disclosure the result of the trial would have been different.

Similarly, with respect to the sentencing phase of the trial, the district court found that there was not a reasonable probability that the alleged "*Brady*" evidence would have altered the outcome because of the overwhelming evidence of Petitioner's guilt, the nature of the murder of Deputy Childress, the behavior exhibited by Petitioner throughout the bank robbery, the total absence of any evidence showing Petitioner has ever accepted responsibility for his offenses, the meager potential for impeachment of the multiple eyewitnesses who testified to Petitioner's threatening conduct inside the bank, and the absence of any significantly mitigating value to any of the allegedly "withheld" or "suppressed" evidence.

In sum, the district court concluded that there is no reasonable probability that, but for the failure of the

17

prosecution to disclose any of the alleged "*Brady*" evidence, even when viewed collectively, the outcome of either phase of Petitioner's capital murder trial would have been different. We find that reasonable jurists could not debate this conclusion, nor could jurists conclude that this claim deserves encouragement to proceed further, and we decline to issue a COA on this claim.

C. Delay in Execution and Retaliatory Setting of an Execution Date Claims

In his fourth and fifth claims for relief, Petitioner contends that (1) the extended period during which he was denied the assistance of counsel for the purpose of pursuing state collateral review of his capital murder conviction and death sentence, (2) the alleged withholding of exculpatory evidence by the State, and (3) the setting of multiple execution dates combined with (4) his prolonged stay on death row violate his rights under both the Eighth and Fourteenth Amendments and the International Covenant on Civil and Political Rights ("ICCPR"). Petitioner also contends that the State violated these rights by setting an execution date following the federal district court's dismissal without prejudice of his first federal habeas corpus action.

The district court found that Petitioner's first two contentions related to his fourth and fifth claims for relief have no merit. First, the Supreme Court has held that there is no constitutional right to the assistance of counsel in a state

18

habeas corpus challenge to an otherwise final criminal conviction. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Second, allegations of infirmities in state habeas corpus proceedings, such as Petitioner's complaints that he was denied adequate discovery in his state habeas corpus proceedings, do not constitute grounds for federal habeas relief. *See Rudd v. Johnson*, 256 F.3d 317, 319-20 (5th Cir. 2001) (recognizing that an attack on a state habeas corpus proceeding is an attack on a proceeding collateral to the petitioner's detention and not on the validity of the detention itself), *cert. denied*, 534 U.S. 1001 (2001). Third, as explained in Section III.B. *supra*, Petitioner has not presented "exculpatory" evidence that the State had withheld from him.

The district court found that Petitioner's remaining contentions, (1) that the State violated his rights by setting multiple execution dates and prolonging his stay on death row and (2) that the State violated his rights by setting an execution date after his first federal habeas corpus action had been dismissed without prejudice, are foreclosed by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *See Teague*, 489 U.S. at 310. Under *Teague*, a

19

new rule is one which either breaks new ground, imposes a new obligation on the States or the Federal Government or was not dictated by precedent existing at the time the defendant's conviction became final.[18] *Graham v. Collins*, 506 U.S. 461, 467 (1993) (quoting *Teague*, 489 U.S. at 301). Unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.* (quoting *Saffle v. Parks*, 494 U.S. 484, 488 (1990)). The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.[19] *O'Dell v. Netherland*,

---

[18] A conviction becomes final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). Because Petitioner did not file a petition for certiorari, his conviction became final for *Teague* purposes on May 16, 1989. The Texas Court of Criminal Appeals issued its opinion affirming Petitioner's conviction and sentence on February 15, 1989. Petitioner then had 90 days to file a certiorari petition with the United States Supreme Court. *See Id.; Daniel v. Cockrell*, 283 F.3d 697, 705 (5th Cir. 2002). Because Petitioner did not file a certiorari petition, his conviction became final on the ninetieth day following the affirmance by the Texas Court of Criminal Appeals – May 16, 1989.

[19] The second exception to *Teague* only applies "to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." *Graham v. Collins*, 506 U.S. 461, 478 (1993).

521 U.S. 151, 157 (1997) (citing *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989) and *Graham v. Collins*, 506 U.S. 461, 478 (1993)). Neither of these two exceptions applies to Petitioner's contentions.

Petitioner does not cite any authority in existence as of the date his conviction became final for *Teague* purposes, May 16, 1989, which would have compelled reasonable jurists on that date to accept either Petitioner's fourth or fifth claim for relief. As of May 16, 1989, no American court had held that the Eighth Amendment's prohibition against cruel and unusual punishment or the terms of the ICCPR prohibit the execution of a convicted capital murderer who has successfully avoided multiple execution dates by filing actions in state and federal court collaterally attacking his conviction and sentence. The only impediments to Texas carrying out Petitioner's sentence that have arisen since the Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence in 1989 have been of Petitioner's own creation.

Likewise, as of May 16, 1989, no federal court had ever held that a state court's allegedly retaliatory setting of an execution date following the dismissal without prejudice of a federal habeas corpus petition invalidates an otherwise valid sentence of death.

Accordingly, we find that reasonable jurists could not

21

debate the district court's conclusion that Petitioner's fourth and fifth claims for relief are without merit, nor could jurists conclude that these claims deserve encouragement to proceed further, and we decline to issue a COA on these claims.

    D.    <u>Ineffective Assistance of Counsel Claim</u>

In Petitioner's sixth claim for relief, he contends that the state trial court violated his constitutional right to the effective assistance of counsel when it denied Petitioner's request for appointment of a second attorney and when it appointed two independent mental health experts to evaluate Petitioner, rather than an expert who would work solely for the defense.

The district court found that both of these claims have no merit for multiple reasons.[20] First, as of the date Petitioner's conviction became final for *Teague* purposes (May 16, 1989), no American court had ever held that the due process principles discussed by the Supreme Court in *Ake v. Oklahoma*[21] mandated

---

[20] In addition to the reasons discussed herein, the district court also found (1) that Petitioner failed to demonstrate that the alleged constitutional error committed by the state trial court in this claim was not "harmless," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *White v. Johnson*, 153 F.3d 197, 201-02 (5th Cir. 1998), *cert. denied*, 529 U.S. 1149 (1999); and (2) that Petitioner did not satisfy the "prejudice" prong of the *Strickland v. Washington* test for the denial of effective assistance of trial counsel guaranteed by the Sixth Amendment. 466 U.S. 668, 687-88 (1984). The "prejudice" prong requires the Petitioner to establish that there is a reasonable probability that, but for the deficient performance of his trial counsel, the outcome of either phase of petitioner's capital murder trial would have been different. *Id*. at 694.

[21] 470 U.S. 68 (1985).

appointment of <u>two</u> attorneys to serve as defense counsel in all capital murder trials.  Likewise, no American court had held that multiple defense counsel were required by the United States Constitution, under either the Sixth or Eighth Amendments, in every capital murder prosecution.  Thus, Petitioner's contention that his constitutional rights were violated by the state court's failure to appoint a second trial counsel is foreclosed by *Teague*.[22]

Second, although Petitioner's trial counsel requested a mental health expert to examine Petitioner prior to the hearing on Petitioner's competence to stand trial and to report his or her findings to the state court, Petitioner's trial counsel never requested that a mental health expert be appointed to solely assist the defense.  Thus, Petitioner's contention that his constitutional rights were violated by the state court's failure to appoint a mental health expert to solely assist the defense has no merit because Petitioner never requested such an expert.[23]

---

[22] The district court also noted that the state trial judge who had presided over Petitioner's trial specifically found during the state habeas proceeding that Petitioner's lead trial counsel was assisted by court-appointed co-counsel Roger Trevino and a court-appointed investigator and that a third attorney, Ed Camara, also assisted Petitioner's lead trial counsel at times.

[23] The district court found that Petitioner's claim would be barred by the *Teague* doctrine even assuming that Petitioner's trial counsel did request such an expert.  The Supreme Court ruled in *Ake* that an indigent criminal defendant is entitled to psychiatric assistance when either (1) the defendant's sanity is likely to be a significant factor at trial or (2) the prosecution presents psychiatric evidence of an indigent defendant's future dangerousness in a capital sentencing proceeding.  *Ake*, 470 U.S. at 82-84. However, the Supreme Court has never extended the rule in *Ake* to apply to situations such as the Petitioner's, in which an indigent criminal defendant's

Accordingly, we find that reasonable jurists could not debate the district court's conclusion that Petitioner's sixth claim for relief is without merit, nor could jurists conclude that this claim deserves encouragement to proceed further, and we decline to issue a COA on this claim.

E.   Representation of Hispanics and Women on Petitioner's Grand Jury

In his eighth claim for relief, Petitioner contends that the process used for selecting grand jurors in Wilson County results in an underrepresentation of Hispanics, women and Hispanic women on grand juries in that county, and that this underrepresentation violated his constitutional rights under both the Fourteenth Amendment's Equal Protection Clause and the Sixth Amendment's "fair cross-section" requirement.

The Supreme Court has clearly and consistently stated that indictment by a grand jury from which members of a racial group purposefully have been excluded violates equal protection principles. *See, e.g., Rose v. Mitchell*, 443 U.S. 545, 556 (1979); *Castaneda v. Partida*, 430 U.S. 482, 492 (1977); *Strauder v. West Virginia*, 100 U.S. 303, 307-10 (1879).  In order to show

---

trial counsel made a specific request for a neutral evaluation of the defendant's sanity and competency to stand trial but no request for the appointment of a confidential defense expert like that envisioned by *Ake*. Petitioner failed to present the state trial court with any evidence showing that his sanity at the time of his offense would likely be a significant issue at trial, nor did the prosecution offer expert opinion testimony at the punishment phase of Petitioner's capital murder trial.  Extension of the rule in *Ake* to a situation such as Petitioner's is foreclosed by the non-retroactivity doctrine announced in *Teague*.

24

that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of the members of a race or another identifiable group. *See Mitchell*, 443 U.S. at 565; *Partida*, 430 U.S. at 494. The test for determining whether this standard has been satisfied has four components: (1) the petitioner must establish the excluded group is a recognizable, distinct class, singled out for different treatment under state law, as written or as applied; (2) the degree of underrepresentation must be proved by comparing the population of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time; (3) there must be a selection procedure that is susceptible of abuse or is not racially neutral to support the presumption of discrimination raised by the statistical showing; and (4) once the petitioner establishes the foregoing prima facie case, the burden shifts to the State to rebut the prima facie case. *Mitchell*, 443 U.S. at 565; *Partida*, 430 U.S. at 494-95.

With respect to Petitioner's equal protection claim based on an underrepresentation of Hispanics, the district court found that Petitioner failed to satisfy any of the three elements required to establish a prima facie case. Specifically, Petitioner did not present evidence indicating that Hispanics in Wilson County had been singled out for different treatment by

25

state law as written or applied, that Hispanics were underrepresented in the grand jury pool over a significant period of time, or that Wilson County employed a selection procedure that is susceptible of abuse or is not racially neutral.

With respect to Petitioner's equal protection claim based on an underrepresentation of women, the district court found that Petitioner failed to satisfy the first required element. More specifically, Petitioner failed to show that, in terms of the selection of grand jurors, women had been singled out for different treatment in Wilson County. Petitioner also failed to overcome evidence indicating grand jury commissioners attempted to comply with the fifty-fifty gender split urged by their supervising judge, and that gender-neutral factors most likely explain the difference in female participation on Wilson County grand juries over the time period in question. Finally, the district court also noted that five of the twelve persons who actually served on the grand jury that indicted Petitioner were female.

With respect to Petitioner's equal protection claim based on an underrepresentation of Hispanic women, the district court found that Petitioner failed to present evidence showing a pattern of historical discrimination against Hispanic women has ever existed in Wilson County. Petitioner also failed to present evidence of any intentional discrimination against Hispanic women in grand jury selection in Wilson County. In fact, Hispanic

26

women were overrepresented among Wilson County grand jury commissioners during the time period in question.

In addition to the equal protection right discussed above, the Sixth Amendment guarantees a criminal defendant the right to have his or her jury chosen from a venire or panel representing a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527-30 (1975); *Holland v. Illinois*, 493 U.S. 474, 478-83 (1990). In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). The district court found that Petitioner failed to present evidence demonstrating that any underrepresentation was due to systematic exclusion of the group in the jury-selection process.[24]

For the foregoing reasons, the district court found that Petitioner's eighth claim for relief has no merit. We agree. Under such circumstances, the district court's conclusion that

---

[24] The district court also found that the Supreme Court has never applied this principle to the selection process for state grand juries, foreclosing this argument on account of the non-retroactivity doctrine of *Teague v. Lane*.

27

Petitioner's eighth claim is without merit is not debatable amongst jurists of reason, nor could jurists conclude that this claim deserves encouragement to proceed further. Accordingly, we decline to issue a COA on this claim.

F. Representation of Hispanics on Petitioner's Petit Jury

In his ninth claim for relief, Petitioner contends that Hispanics are underrepresented on Atascosa County petit jury venires in sufficiently substantial margins to violate both the Fourteenth Amendment's equal protection guarantee and the Sixth Amendment's guarantee of a petit jury selected from a fair cross-section of the community.

The applicable federal constitutional standards for deciding these claims are set forth in Section III.E. *supra*.

The district court found that Petitioner presented no evidence to either his state trial court or state habeas court regarding either the ethnic composition of Atascosa County's adult population or the ethnic composition of petit jury venires in that county. Because he did not present evidence showing that Hispanics were underrepresented on Atascosa County petit jury venires in relation to their percentage of the county's adult population, Petitioner did not establish a prima facie case of an equal protection or a Sixth Amendment violation. Accordingly, the district court denied Petitioner relief on this claim.

The district court's conclusion that Petitioner's ninth

28

claim is without merit is not debatable amongst jurists of reason, nor could jurists conclude that this claim deserves encouragement to proceed further.  Accordingly, we decline to issue a COA on this claim.

G.    Cumulative Error Claim

In his tenth and final claim for relief, Petitioner contends that the cumulative impact of the alleged violations of his federal constitutional rights outlined in his amended petition independently warrants federal habeas corpus relief.

The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness.  *See Jackson v. Johnson*, 194 F.3d 641, 655 n.59 (5th Cir. 1999), *cert. denied*, 529 U.S. 1027 (2000).

The district court found that Petitioner could not demonstrate that the cumulative error doctrine should apply because none of the alleged errors about which Petitioner complains rises to the level of a constitutional violation.  *See Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc) (holding that in order to merit federal habeas relief, the individual errors must involve matters of constitutional dimension rather than mere violations of state law), *cert. denied*, 508 U.S. 960 (1993); *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993) (stating that because certain errors were not of

29

constitutional dimension and other claims were meritless, "Yohey has presented nothing to cumulate").  Moreover, the district court found that Petitioner's state court capital murder trial was not rendered fundamentally unfair by virtue of any of the matters about which Petitioner complains in this Court. Accordingly, the district court denied relief based on a cumulative error theory.

The district court's conclusion that Petitioner's cumulative error claim is without merit is not debatable amongst jurists of reason, nor could jurists conclude that this claim deserves encouragement to proceed further.  Accordingly, we decline to issue a COA on this claim.

## IV. CONCLUSION

Petitioner has not shown that reasonable jurists could disagree with the district court's denial of any of his claims. Accordingly, we deny Petitioner's Application for a Certificate of Appealability from Denial of a Petition for Writ of Habeas Corpus.

DENIED.