JERRY E. SMITH, Circuit Judge, dissenting:
*168 For the first time ever, this court finds a meritorious claim of actual innocence under McQuiggin v. Perkins , 569 U.S. 383, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013). But, given the panel majority's errant analysis under Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), I would reverse and deny habeas corpus relief. I therefore respectfully dissent from the cogent and well-intended majority opinion.
"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."[1] That "is [a] difficult [standard] to meet ... [and] it was meant to be."[2] Meeting that standard can become even more unlikely where, as here, a claim is adjudicated on the merits but lacks a written opinion elucidating the state court's reasons. Floyd "can satisfy the 'unreasonable application' prong of [ 28 U.S.C.] § 2254(d)(1)only by showing that 'there was no reasonable basis ' for the [Louisiana] Supreme Court's decision."[3] "[A] habeas court must determine what arguments or theories supported or, as here, could have supported , the state court's decision."[4]
Though the majority recites the appropriate standards, its Brady methodology fails to apply them rigorously. Instead, it allows its analysis to become colored by the gateway question of whether Floyd proved actual innocence under Perkins . This is one of the rare occasions where we must cope with the tension between a meritorious gateway actual-innocence claim and the strong deference AEDPA accords to a state court's resolution of the underlying constitutional claim-the latter being the only type of claim that can justify relief.[5]
To understand why it is possible to find a petitioner, such as Floyd, "actually innocent" while simultaneously denying him habeas relief, it is important to recognize exactly what an actual-innocence claim is. First, it is a gateway claim. Neither this circuit nor the Supreme Court has recognized a freestanding claim of innocence. Instead, a petitioner can assert actual innocence only to overcome a procedural bar, such as limitations.[6] After establishing actual innocence, the petitioner must still prove a meritorious constitutional violation while overcoming § 2254 's mandated deference. Without a meritorious constitutional violation, an actual-innocence claim is meaningless.
Second, the postures in which we review the actual-innocence claim and the underlying constitutional claim are different.
*169 Because an actual-innocence claim is a gateway claim asserted to overcome some procedural barricade, it is a claim that has not been reviewed by a state court and thus is accorded no AEDPA deference. A federal court independently determines whether the Perkins standard is met. Conversely, the Brady claims here were adjudicated on the merits by the Louisiana Supreme Court and thus are accorded AEDPA deference. We cannot independently determine whether the Brady standard is met. Instead, we must add an additional layer and decide whether " 'there was no reasonable basis ' for the [Louisiana] Supreme Court's decision."[7]
Finally, but importantly, when reviewing Floyd's Brady claims, we cannot consider much of the new evidence presented in the actual-innocence analysis. Under Perkins , we can take into account old and new (reliable) evidence alike. To determine materiality under Brady , however, we can consider only the evidence presented at trial and the suppressed evidence. Thus, new and arguably strong evidence favoring Floyd, such as the fact that he was shown photos of the crime scene, cannot, as a matter of law, color our review of the alleged Brady violations.
I commend the majority for rectifying the bifurcation concerns originally raised by my initial dissent. But, even without the initial taint of de novo review, the majority still accords insufficient AEDPA deference to the state court. "[C]lear error [does] not suffice" to show an "unreasonable application." White v. Woodall , 572 U.S. 415, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014) (internal citation and quotation marks omitted).[8] Instead, " 'the state court's ruling on the claim being presented in federal court [must be] so lacking in justification that there [is] an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' " Id. (quoting Richter , 562 U.S. at 103, 131 S.Ct. 770 ).
When its decision is viewed in the proper light, the state court plainly had a reasonable basis for denying relief under Brady . To prove a Brady violation, the petitioner must show that the evidence was withheld, favorable, and material.[9] I agree in full with the majority's analysis in regard to suppression. Thus, I address only the other two Brady prongs, favorability and materiality.
Floyd says that the following evidence is Brady material: analysis of fingerprints found on a whiskey bottle in Hines's kitchen; analyses of fingerprints lifted from two drinking glasses in Robinson's hotel room, on the passenger side of Robinson's car, and on a glass, cup, and whiskey bottle in Robinson's car; and John Clegg's statement concerning Hines's sexual preferences. The majority classifies the fingerprint analysis from the whiskey bottle as favorable because the analysis could be used to impeach state witness Detective Dillmann. Of note, neither Floyd nor the district court ever contended that the fingerprint analyses could constitute impeachment evidence. Those analyses, however, could reasonably be viewed as not impeaching Dillmann.
*170 The majority avers that the analysis impeaches Dillmann because he testified that the presence of glasses corroborated Floyd's confession, in which Floyd stated, "We were both drinking." Dillmann, however, never mentioned the whiskey bottle or even whiskey. Instead, he testified only that "there were two highball glasses filled with a liquid on each side of the bed." And, the whiskey bottle was not found at the murder scene[10] but in the kitchen.
The majority does not address these details with enough precision,[11] so let me emphasize this: The unidentified fingerprints were found on the whiskey bottle, not the highball glasses, and Dillmann never mentioned the "whiskey bottle" or "whiskey" generally. Reviewing with AEDPA deference, it is easy to see that the presence of an unidentified third party's partial prints on a whiskey bottle located in the kitchen could reasonably be interpreted as not impeaching Dillmann's testimony that the presence of glasses in the bedroom (the murder scene) corroborated Floyd's confession that he and Hines shared a drink.[12]
The majority also contends that the fingerprint analysis is "favorable because it supported Floyd's third-party-guilt defense." Though the majority is correct that evidence strengthening a defense can be favorable under Brady , the majority again fails to view the issue through the proper lens.
We must review whether it would be reasonable for the Louisiana courts to conclude that the presence of an unidentified third party's partial prints on a whiskey bottle not directly connected to the murder scene does not strengthen Floyd's third-party defense. Without a stronger connection between the item containing the fingerprints and the crime, it is not unreasonable for the Louisiana courts to conclude the evidence did not strengthen the defense[13] and thus was only neutral evidence *171 of innocence or guilt.[14]
AEDPA deference requires us to test for any reasonable explanation. And it is plausible to characterize the fingerprint analysis "as neutral evidence." Sipe , 388 F.3d at 487. Review of the fingerprint analysis rightly ends here, on the favorability prong.
Regarding the analyses of the fingerprints from the Robinson crime scene, all of the prints on one glass in the hotel room belonged to Robinson, while all others belonged to an unidentified person. Unlike the prints discovered at the Hines crime scene, some but not all of the prints at the Robinson crime scene were on items potentially connected to the murder. The prints on the drinking glasses in the hotel room (the murder scene) certainly could serve as exculpatory evidence-for the Robinson murder. Some may believe that additional evidence exculpating Floyd of the Robinson murder could potentially favor exculpation from the Hines murder. But it is also reasonable to believe that evidence exculpating Floyd of one murder-a murder that he was previously acquitted of because there was already evidence presented in the joint case exculpating him of that murder-does not tend to show innocence of the other murder.
And, the prints from the vehicle suffer largely the same fate as the prints at the Hines crime scene. The vehicle has never been directly connected to the crime, and it would not be unreasonable for there to be numerous third-party prints (including those of Robinson's friend whom he drove home earlier in the evening) within a vehicle.[15] Thus, the prints from the vehicle could easily be classified as neutral, and, after we accord AEDPA deference, so too could the prints on glasses found at the Robinson crime scene.
Even if the fingerprints on the glasses should have properly been deemed favorable, they would still fail the materiality prong. Throughout the joint trials, the defense undermined Floyd's confession to the Robinson murder with numerous other pieces of evidence, such as the fact that though Floyd claimed he wiped himself with a tissue after receiving oral gratification from Robinson, that tissue actually contained semen that could not belong to either Floyd or Robinson.
So, ample evidence at trial indicated the presence of a third party and undermined *172 the credibility of Floyd's confession. A state court could thus deem any additional evidence to be cumulative and not material under Fifth Circuit precedent.[16]
As for Clegg's statement, I agree that it could only reasonably be labeled as favorable, because it could be used to weaken Dillmann's testimony that during his "follow-up investigation, initially after the homicide," he spoke "with several people ... [and] had learned that Mr. Hines' sexual preferences was not to any one race. He was involved with both black and white males, and he was very indiscriminate ...."[17] Dillmann interviewed Clegg and reported that Clegg stated Hines was indiscriminate in his tastes. Thus, Clegg's contradictory statement-that Hines had only ever pointed out black men the few times Clegg and Hines went to gay bars together-would serve as impeachment evidence.
That statement, however, fails the final prong of Brady -materiality. As the majority notes, under that prong we consider "the cumulative effect of all [suppressed] evidence." Sipe , 388 F.3d at 478. But, "[w]e include in this cumulative materiality analysis only the evidence that survived Brady' s other prongs ...." Id . at 491. As the only piece of evidence to clear the first two prongs, the Clegg statement is correctly evaluated by itself.[18]
The state court could have reasonably concluded that Clegg's statement was not material. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley , 473 U.S. at 682, 105 S.Ct. 3375. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. "[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' "[19] " 'The materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.' "[20]
Clegg admitted he had limited knowledge of Hines's sexual preferences.[21] The state court could conclude that Clegg's statement does not significantly dispel the possibility that Hines was open to relations with a white male nor that a white male could have committed the murder. At least Thomas Bloodworth, another good friend of Hines's, testified he had never seen Hines "socially in the company of a black *173 person" other than one friend who had moved away.
Regardless, learning that Clegg (who had moved out of the state ten years before and had been back only for visits)[22] had, in the few instances they were at gay bars together, only heard Hines point out specific black men as attractive, can easily be regarded as not throwing the case into a whole new light or undermining confidence in the verdict. That is especially true in comparison to the value of the opposing evidence-Floyd's separate confessions to the police and to bar owner Steven Edwards. Thus, when we apply AEDPA deference, the state court reasonably could have discounted Clegg's statement.[23]
In sum, we are bound by AEDPA and Brady . Under AEDPA, we accord strong deference to the state court and test for any reasonable basis on which its decision could rest. Under Brady , we look only at evidence presented at trial and any allegedly suppressed evidence-but no more. For these reasons, the district court erred, and I respectfully dissent.

Harrington v. Richter , 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting Yarborough v. Alvarado , 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ).

Id. at 102, 131 S.Ct. 770.

Cullen v. Pinholster , 563 U.S. 170, 188, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (quoting Richter , 562 U.S. at 98, 131 S.Ct. 770 ) (emphasis added).

Richter , 562 U.S. at 102, 131 S.Ct. 770 (emphasis added).

See Perkins , 569 U.S. at 392, 133 S.Ct. 1924 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); United States v. Fields , 761 F.3d 443, 479 (5th Cir. 2014) ("[O]ur caselaw does not recognize freestanding actual innocence claims.").

Perkins , 569 U.S. at 386, 133 S.Ct. 1924 (holding that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations").

Pinholster , 563 U.S. at 188, 131 S.Ct. 1388 (quoting Richter , 562 U.S. at 98, 131 S.Ct. 770 ) (emphasis added).

See also Williams v. Taylor , 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("an unreasonable application of federal law is different from an incorrect application of federal law").

Strickler v. Greene , 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ; see also United States v. Sipe , 388 F.3d 471, 477-78 (5th Cir. 2004).

Hines was murdered in his bedroom. No testimony or evidence was provided that indicated he or the murderer ever entered the kitchen. The majority says that "Detective Dillmann testified about the importance of evidence discovered in Hines' kitchen." As with its discussion of the whiskey bottle, the majority again fails to address Dillmann's testimony with precision.
Dillmann never even mentioned the kitchen. The one time the word "kitchen" was used during his examination, it was by Floyd's attorney asking whether Floyd's confession contained any specific details about the layout of the apartment, such as where the bedroom and kitchen were located. Dillmann did not even reply because the court interrupted and asked the attorney to allow Dillmann to finish his testimony on a previous line of questioning.

See, e.g. , "Rather, Detective Dillmann testified the evidence of the glasses of whiskey discovered in Hines' apartment ... corroborated 'perfectly' the descriptions in Floyd's confession, and supported its credibility." (emphasis added).

The majority responds by claiming that Dillmann provided "erroneous" testimony, given that he said there were two glasses in the bedroom. The majority points to a tech report that says the tech dusted a glass in the bedroom and a glass in the kitchen. First, the majority has decided, because it fits its narrative, to credit the tech over Dillmann. That is curious because, as the majority admits, the photograph from the kitchen depicts two bottles of whiskey but no whiskey glass (or glasses of any sort). Thus, the glass was not "with the whiskey bottle" as the majority states. Second, it is possible for Dillmann and the tech report both to be accurate, as maybe there were a glass in the kitchen and two glasses in the bedroom. Third, even assuming Dillmann mischaracterized where the glasses were, that does not undermine the fact that there is no evidence connecting the kitchen to the murder scene, and Dillmann still never testified about "whiskey."

See, e.g. , Lines v. Terrell , No. CIV. A. 07-3532, 2009 WL 2870162, at *15 (E.D. La.), report and recommendation adopted , No. CIV. A. 07-3532, 2009 WL 2929334 (E.D. La. 2009) ("While evidence regarding the lack of petitioner's fingerprints might have been helpful to the defense, that is not the standard for required disclosure. Brady is not violated simply because potentially helpful information is withheld. ... [T]he negative fingerprint analysis would not show that petitioner never handled the evidence, but rather only that there were no fingerprints proving that he had done so. That information is not exculpatory and does not put the whole case in such a different light as to undermine confidence in the verdict.").

See Black's Law Dictionary 675 (10th ed. 2014) (defining exculpatory evidence as "[e]vidence tending to establish a criminal defendant's innocence."); United States v. Ruiz , 536 U.S. 622, 628, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) ("[E]xculpatory evidence is evidence the suppression of which would 'undermine the confidence in the verdict.' " (quoting Kyles v. Whitley , 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ) ); United States v. Bagley , 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("Such evidence is evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." (internal quotation marks and citations omitted) ).

Accord Sosa v. Dretke , 133 F. App'x 114, 121-22 (5th Cir. 2005) (explaining that the presence of other fingerprints in putative getaway car was not exculpatory because it "merely shows ... that others had been in the car at some point in time").

See , e.g. , Sipe , 388 F.3d at 478 ("Thus, 'when the undisclosed evidence is merely cumulative of other evidence [in the record], no Brady violation occurs.' " (quoting Spence v. Johnson , 80 F.3d 989, 995 (5th Cir. 1996) ) ); Jackson v. Johnson , 194 F.3d 641, 650 (5th Cir. 1999) ("When Brady evidence would have only a cumulative or marginal impact on the jury's credibility assessment, habeas relief is not in order because the evidence is not material ....").

Of note, Dillmann's testimony suggests he relied on more than just one person for his belief that Hines had indiscriminate preferences.

As previously explained, the Hines fingerprint analysis fails the favorability prong. The Robinson fingerprint analyses also fails it, or at the very least is cumulative of evidence presented at trial.

Strickler , 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles , 514 U.S. at 435, 115 S.Ct. 1555 ).

Sipe , 388 F.3d at 478 (quoting Smith v. Black , 904 F.2d 950, 967 (5th Cir. 1990), vacated on other grounds , 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992) ).

Clegg stated in his affidavit, "I was never, in fact, aware of the frequency of [Hines's] sexual relations with anyone."

In fact, Clegg's statement implies that he and Hines had not visited a gay bar together in ten years. That further illustrates why it would be reasonable for a state court to determine that an opinion based on ambiguous statements made ten years before the murder are not material.

Even assuming the majority is correct-that we can only cherry-pick certain sentences from Clegg's affidavit instead of analyzing its reliability as a whole to determine whether the differing statement "put the whole case in such a different light as to undermine confidence in the verdict"-the fact that one friend believed Hines had a penchant only for black men does not inarguably "undermine confidence in the verdict." Strickler , 527 U.S. at 290, 119 S.Ct. 1936 (internal citations and quotation marks omitted).