REVISED JUNE 16, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 99-10446**

---

**ADOLPHO GIL HERNANDEZ,**

**Applicant-Appellant,**

**VERSUS**

**GARY JOHNSON, DIRECTOR OF THE INSTITUTIONAL**
**DIVISION OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**

**Respondent-Appellee.**

---

Appeal from the United States District Court
For the Northern District of Texas

---

May 30, 2000

Before EMILIO M. GARZA, DeMOSS, and BENAVIDES, Circuit Judges.

DeMOSS, Circuit Judge:

Applicant-Appellant Adolpho Gil Hernandez, a Texas death row inmate, whose petition for habeas corpus relief and request for a Certificate of Appealability ("COA") were both denied by the federal district court, now seeks a COA from this Court pursuant to 28 U.S.C. § 2253(c)(2). For the reasons set forth below, we deny the request for a COA.

## I. BACKGROUND

On the evening of September 30, 1988, at about 5:00 p.m., Hernandez and a friend, Mike Martinez, went to the home of Margarita Davila in Slaton, Texas, with an eight-pack of "pony" beers. The three shared the beers, with Davila drinking one and the two men consuming the rest. While at the residence, Hernandez played baseball with Davila's young son, teaching him how to swing a baseball bat. Around 7:30 p.m., Hernandez and Martinez decided to leave the residence to purchase more beer. Before leaving, Hernandez took the baseball bat despite Davila's request to leave the bat alone.

Upon purchasing a six-pack of beer, Hernandez and Martinez went to the home of Kenneth Hodges, where they shared the six-pack with Hodges and another adult male. Eventually, Hernandez and Martinez decided to leave Hodges' home. The two walked together for a short time before they separated. Martinez went to another friend's home to watch the Olympics. Hernandez still carried the bat from Davila's home.

Around 9:00 p.m., Hernandez approached the home of Ysidoro Maldonado, a young boy who lived with his grandmother in a house located in the same area of Slaton as the residence of Elizabeth Alvarado, who ultimately became Hernandez' victim. Upon hearing a knock, Ysidoro looked out the window to see who was on the porch. Unable to see who was there, Ysidoro opened both the front and

2

screen doors. Recognizing Hernandez, Ysidoro asked what he wanted; whereupon, Hernandez swung the bat at the young boy. Ysidoro was able to close the door to avoid being struck by the bat, but the bat broke the screen door. Hernandez ran off in the general direction of Alvarado's home.

A short time later, Josie Vargas, who is Alvarado's daughter, and Reuben Alvarado ("Reuben"), Alvarado's great-grandson, saw Hernandez coming out of Alvarado's kitchen. Both Vargas and Reuben noticed that Hernandez was carrying Alvarado's purse. In addition, Vargas testified that Hernandez was carrying a baseball bat. When Hernandez saw the two individuals outside the house, he retreated back inside and then exited out the front door with the purse and bat in hand. Waiting outside the house, Vargas confronted Hernandez, who stared at her and asked if she was alone. When she replied that she was, Hernandez raised the bat as if he was about to strike her, whereupon Vargas grabbed hold of the bat and wrestled with Hernandez until she was able to get the bat away from him. Vargas then chased Hernandez, striking him with the bat, until he escaped.

Thereafter, Vargas and Reuben entered the home and checked on Alvarado. They found her with her right arm noticeably broken and beaten beyond recognition. Nevertheless, she was apparently alive as she was still breathing. Medical personnel attempted to revive Alvarado, but she was pronounced dead upon arrival at Lubbock General Hospital.

Alvarado was found to have both bones broken in her right wrist. Furthermore, she had lacerations on her head, a broken nose, as well as a depressed fracture of the skull. Alvarado had suffered a massive subdural hemorrhage and had endured eight blows to her head: three to the right side, two to the top, one to the side, and two to the left. According to the pathologist responsible for Alvarado's autopsy, the several hits about her head caused Alvarado's death.

Not more than an hour after the beating, Hernandez was apprehended, hiding behind a tree. After a jury trial, he was convicted of capital murder on January 31, 1990. On February 5, 1990, after a separate hearing on punishment, the jury affirmatively answered the two special issues submitted to it pursuant to former Texas Code of Criminal Procedure article 37.071.[1] As a result, punishment was assessed at death.

Hernandez' conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals, which affirmed both on June 29, 1994. The United States Supreme Court denied his petition for

---

[1]Former article 37.071 provided in pertinent part:
(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
    (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
    (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society . . . .
Tex. Code Crim. Proc. Ann. art. 37.071 (Vernon 1981).

writ of certiorari on April 24, 1995.  *See* **Hernandez v. Texas**, 115 S. Ct. 1798 (1995).

Thereafter, Hernandez filed an application for state writ of habeas corpus.  On September 15, 1998, the state habeas court, which was also Hernandez' trial court, entered findings of fact and conclusions of law, recommending that habeas relief be denied.  The Texas Court of Criminal Appeals adopted those findings and denied Hernandez' application for habeas relief on November 18, 1998.  On November 23, 1998, Hernandez filed an application for federal writ of habeas corpus, which was denied on March 18, 1999.  Furthermore, his application for a COA was denied by the district court on April 23, 1999.  That application is now pending before this court.

## II. DISCUSSION

Because Hernandez' application for writ of habeas corpus was filed on November 23, 1998, it is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See* **Lindh v. Murphy**, 117 S. Ct. 2059 (1997); **Clark v. Johnson**, 202 F.3d 760, 763 (5th Cir. 2000), *petition for cert. filed*, (U.S. Apr. 25, 2000) (No. 99-9327).  "Under AEDPA, before an appeal from the dismissal or denial of a § 2254 habeas petition can proceed, the petitioner must first obtain a COA, which will issue 'only if the applicant has made a substantial showing of the denial of a constitutional right.'"  *See* **id.** (quoting 28 U.S.C. § 2253(c)(2)).

5

Recently, the Supreme Court ratified the standard to obtain a Certificate of Probable Cause, as announced in **Barefoot v. Estelle**, 103 S. Ct. 3383 (1983), as the appropriate standard to determine whether a habeas prisoner has made a substantial showing of the denial of a constitutional right. *See* **Slack v. McDaniel**, 120 S. Ct. 1595, 1603-04 (2000). Under that standard, an applicant makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further. *See* **Clark**, 202 F.3d at 763 (citing **Drinkard v. Johnson**, 97 F.3d 751, 755 (5th Cir. 1996), *overruled in part on other grounds*, **Lindh**, 117 S. Ct. 2059). Specifically, where a district court has rejected a prisoner's constitutional claims on the merits, the applicant must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See* **Slack**, 120 S. Ct. at 1604. "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." **Id.** Because the present case

6

involves the death penalty, any doubts as to whether a COA should issue must be resolved in Hernandez' favor. *See **Clark***, 202 F.3d at 764.

A state court's determination of a factual issue shall be presumed to be correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); ***Davis v. Johnson***, 158 F.3d 806, 812 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1474 (1999). When the state habeas court and the trial court are one and the same, the presumption is especially strong. *See **Clark***, 202 F.3d at 764.

In his application, Hernandez presents two issues for which he seeks a COA: 1) whether he was denied the effective assistance of counsel when his court-appointed trial attorneys failed to recognize the validity and importance of an alcoholic blackout defense, and 2) whether he was denied a fair trial when the State allegedly utilized and relied upon materially inaccurate evidence. We now address those issues in light of the standards for the issuance of a COA.

### A.

Hernandez' first challenges his trial counsel's performance at trial and sentencing, arguing that they failed to recognize the validity and importance of an alcoholic blackout defense. To prevail on an ineffectiveness of counsel claim, Hernandez must show that his trial counsel's performance was deficient and that the

7

deficiency prejudiced his defense. *See Strickland v. Washington*, 104 S. Ct. 2052, 2064 (1984). The trial counsel's performance is deficient when the representation falls below an objective standard of reasonableness. *See id.; Davis*, 158 F.3d at 812. In assessing the trial counsel's performance, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 104 S. Ct. at 2065. There is a strong presumption that the trial counsel's conduct falls within the wide range of objectively reasonable conduct. *See id.*

To establish that the trial counsel's deficiency prejudiced his defense, Hernandez "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Thus, when a defendant challenges a conviction, we must ask whether, absent the errors, a reasonable probability exists that the jury would have had a reasonable doubt as to guilt. *See id.* at 2068-69. When the challenge is to a sentence, we must examine whether, absent the errors, a reasonable probability exists that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *See id.* at 2069.

8

Here, Hernandez maintains that his trial counsel's failure to recognize the validity and importance of an alcoholic blackout defense constituted deficient performance that prejudiced his overall defense at trial and at sentencing. First, he notes that at trial and at sententcing, his trial counsel did not enlist an expert to aid their understanding of Hernandez' condition on the night of the murder. Second, Hernandez argues that his trial counsel failed to present available evidence that would show: a) that alcohol consumption by an alcohol-dependent individual is compulsive, not voluntary, and that, therefore, Hernandez did not voluntarily consume alcohol; and b) that Hernandez was in a state of anterograde, rather than typical, amnesia and, consequently, could not have acted intentionally or deliberately. Third, Hernandez believes that by not recognizing the alcoholic blackout defense, his trial counsel did not develop or tie in evidence of prior alcoholic blackouts to the blackout surrounding the instant offense and, thus, failed to use any such evidence to mitigate the offense. Fourth, he contends that his trial counsel's inability to understand the importance of the alcoholic blackout defense deprived him of a material fact witness that would have supported his defense. Dave Martinez, the lead trial attorney on the case, is Hernandez' cousin and was the first individual whom he called after being arrested. According to Dave Martinez, Hernandez could be heard in the background during Martinez' conversation with the police. Moreover, Hernandez did not appear to understand what was

9

going on or what charges were being pressed against him. Hernandez suggests that if his trial counsel had realized the importance of the alcoholic blackout defense, then Dave Martinez would not have participated as a defense attorney and would, instead, have provided support by testifying as a fact witness as to Hernandez' condition on the night of the murder. The gist of Hernandez' allegations is that by failing to recognize the importance of an alcoholic blackout defense, his trial counsel did not offer evidence that his actions on the night of the murder were not voluntary or intentional.

All of these allegations, however, do not amount to a substantial showing of the denial of a constitutional right. Under Texas law, voluntary intoxication does not constitute a defense to the commission of a crime. *See* Tex. Pen. Code Ann. § 8.04 (Vernon 1994). Neither does evidence of voluntary intoxication negate the element of specific intent required for capital murder. *See Raby v. State*, 970 S.W.2d 1, 6 (Tex. Crim. App. 1998), *cert. denied*, 119 S. Ct. 515 (1998). Although involuntary intoxication may absolve one of criminal culpability, *see Torres v. State*, 585 S.W.2d 746, 749 (Tex. Crim. App. 1976), Texas courts have consistently ruled that alcoholism may not be the basis for an involuntary intoxication defense, *see Shurbet v. State*, 652 S.W.2d 425, 428 (Tex. App.–Austin 1982, no pet.); *Heard v. State*, 887 S.W.2d 94, 98 (Tex. App.–Texarkana 1994, pet. ref'd) (referring to *Shurbet* for

10

support); *cf.* **Martinez v. State**, No. 04-95-00032-CR, 1996 WL 134969, at *3 (Tex. App.–San Antonio March 27, 1996, no pet.) (unpublished disposition) (holding that evidence of an addiction does not warrant an instruction on involuntary intoxication). Thus, Hernandez' consumption of alcohol on the night of the murder was not involuntary, and he could not have predicated a defense on the possibility that he was in an alcoholic blackout. Therefore, his trial counsel's failure to obtain an expert on alcoholism, to counter with evidence the State's argument that he voluntarily drank alcohol and intentionally committed the murder, to tie in past incidents of alcoholic blackouts, or to realize that Dave Martinez might be the sole witness to Hernandez' alcoholic blackout was immaterial and irrelevant to the guilt-or-innocence phase of the trial. None of those failures translate to deficient performance at trial on the part of Hernandez' trial counsel; nor did those failures prejudice his defense.

Admittedly, Hernandez' trial counsel could have introduced evidence about alcoholic blackouts to mitigate punishment. *See* Tex. Pen. Code Ann. § 8.04(b) ("Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried."). But they would first have had to establish 1) that Hernandez' voluntary intoxication caused him not to know his conduct was wrong or 2) that it caused him to be incapable of

11

conforming his conduct to the requirements of the law that he violated. *See* **Cordova v. State**, 733 S.W.2d 175, 190 (Tex. Crim. App. 1987). Mere voluntary intoxication on the part of Hernandez would have been insufficient to warrant an affirmative instruction on temporary insanity caused by voluntary intoxication. *See* **id.**

According to the state habeas court's findings of fact, there was no evidence in the record that Hernandez suffered from an alcoholic blackout or was even intoxicated. Instead, various witnesses, from Davila to Mike Martinez, testified that Hernandez was not drunk or that they were unsure that he had even been drinking on the night of the murder. We must presume that those findings are correct unless they are rebutted by clear and convincing evidence.

Hernandez has failed to do that. He does not refer to any evidence in the record indicating that he was drunk or in an alcoholic blackout on the night of the murder; nor could he considering the tenor of the evidence. At trial, any discussion about blackouts or Hernandez' drunken nature were in reference to past incidents, and not to the night in question. Although Hernandez clearly drank alcohol before murdering Alvarado, the record just does not lend credence to the view that Hernandez was somehow intoxicated, let alone temporarily insane.

Indeed, the record reveals that Hernandez took a baseball bat from Davila's home despite Davila's objections, that Hernandez

12

attempted to break into the Maldonado residence, that Hernandez questioned Vargas as to her being alone before he attacked her, that Hernandez stole property from Alvarado's home, that Hernandez disposed of the stolen property and part of the clothing that he had on during the murder, and that Hernandez was hiding when the police arrested him. All of those events demonstrate intentional conduct on the part of Hernandez and that he was aware of his actions.

The evidence that Hernandez proffers and that is most suggestive of intoxication, and possibly temporary insanity, is the affidavits of Dr. Brian Derrick and Dave Martinez, both of which were before the state habeas court and were rejected as a basis for relief. Derrick's affidavit relies on portions of the trial record rather than any first-hand examination of Hernandez on the night of the murder. Other than Hernandez' consumption of beer that night and the arresting officer's statement that Hernandez smelled of alcohol at the time he was arrested, none of the factual summary used by Derrick to formulate his opinion makes reference to Hernandez being intoxicated when he murdered Alvarado. Instead, Derrick bases his analysis primarily on instances of past misconduct by Hernandez. Of the factual summary's references that could possibly point to an intoxicated Hernandez on the night of the murder, none are particularly supportive. The mere consumption of alcohol does not necessarily translate into intoxication, nor does the smell of alcohol mean that one was drunk.

13

As for Dave Martinez' affidavit, it is just a subjective statement, from someone who was not present with Hernandez at the time of the offense, that Hernandez was in an alcoholic blackout when he murdered Alvarado. Although Hernandez did apparently tell Dave Martinez that he remembered nothing of that night, Hernandez' statements to Martinez would have been inadmissible hearsay. *See* Tex. R. Crim. Evid. 802. Similarly, Dave Martinez' assertion that, based on the telephone call by Hernandez from jail, he was the only one who could testify as to Hernandez being intoxicated and in an alcoholic blackout is also unavailing. According to Dave Martinez, Hernandez could be heard in the background repeatedly asking the police officer what the charges were and why he was being arrested. Even if those statements were not hearsay, Hernandez' questions to the police officer would not have established that he was intoxicated or temporarily insane. The repetitiousness of Hernandez' questioning could have just reflected his inability to comprehend the legal nature of the charges. Moreover, the fact that Hernandez was hiding from the police belies any suggestion that he was in a drunken stupor, unable to realize why he was being arrested.

But even if Hernandez was intoxicated on the night of the murder, he undeniably knew his conduct was wrong; otherwise, he would not have been hiding from the police, or disposing of the stolen property and his clothing, or attempting to get away from

14

Vargas with force. Neither do Hernandez' violent actions the night of the murder indicate that he was incapable of conforming his conduct to the requirements of the law that he violated. Rather than act in a murderous rage throughout the night, Hernandez acted violently only when he wanted something, such as: 1) to break into the Maldonado residence; 2) to steal from Alvarado; or 3) to escape Vargas' grasp. Clearly, then, Hernandez' voluntary intoxication did not cause him not to know that his conduct was wrong or make him incapable of conforming his conduct to the requirements of the law that he violated so as to warrant an instruction on temporary insanity by intoxication under Texas law.

Thus, we conclude that Hernandez has not demonstrated a substantial showing of the denial of a constitutional right. First, he has not tendered clear and convincing evidence to rebut the presumption of the state court's findings that he was not in an alcoholic blackout or intoxicated. As a result, he could not have established the necessary prerequisites for a determination that he was temporarily insane by intoxication. Second, even if Hernandez was intoxicated on the night of the murder, the evidence does not support a finding that he was temporarily insane under Texas law. Therefore, any failure by Hernandez' trial counsel to recognize the importance of the alcoholic blackout defense was neither deficient performance nor prejudicial to Hernandez' representation, and we must deny a COA on that issue.

B.

15

The second issue presented in Hernandez' application for a COA is whether Hernandez was denied a fair trial because the State utilized and relied upon allegedly materially inaccurate evidence in violation of the Eighth Amendment's protections from cruel and unusual punishment as pronounced in *Johnson v. Mississippi*, 108 S. Ct. 1981 (1988). That issue was before the state habeas court, which denied relief, finding that it was not supported by any credible evidence in the record. Germane to the issue are the testimonies of Drs. James Grigson and Ralph Erdmann. Hernandez maintains that Grigson testified falsely as to the number of defendants that he had interviewed to determine their propensity for future dangerousness and that this testimony greatly influenced the jury's answer as to whether Hernandez posed a future danger. In addition, Hernandez asserts Erdmann falsely testified as to examining the victim's heart, and therefore, Erdmann could not have honestly stated that Alvarado's cause of death was not a heart attack. Due to Erdmann's supposedly false testimony, Hernandez contends that the jury was convinced of the baseball attack as having caused Alvarado's death, and this belief persuaded the jury that he was a future danger.

*Johnson* involved a death sentence under Mississippi law. Before imposing the death penalty, a Mississippi jury had to determine whether aggravating circumstances outweighed mitigating circumstances. *See id.* at 1984. In that case, the jury found

16

three aggravating circumstances: 1) the defendant had previously been convicted of a violent felony; 2) the defendant had committed the capital murder for the purpose of avoiding arrest or effecting an escape from custody; and 3) the capital murder was especially heinous, atrocious, and cruel. *See id.* The sole basis for the first aggravating circumstance was a document showing that the defendant had been convicted in New York of second-degree assault with intent to commit first-degree rape. *See id.* After weighing the aggravating and mitigating circumstances, the jury concluded that the three aggravating circumstances outweighed the mitigating ones, and the death penalty was imposed. *See id.*

Thereafter, the New York felony conviction was reversed, and the defendant sought post-conviction relief on the ground that the New York conviction was invalid and could not be used as an aggravating circumstance. *See id.* at 1985. The Supreme Court ultimately reversed the death sentence, noting that the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment. *See id.* at 1986. The Court remarked that to allow the jury to consider evidence that was materially inaccurate was error. *See id.* at 1989.

The present case does not parallel the situation addressed in *Johnson* nor the vast majority of cases that have relied upon *Johnson* to determine whether evidence of a criminal conviction or

17

conduct may be properly admitted at sentencing.  Instead of a materially inaccurate criminal conviction, we confront purportedly materially inaccurate testimony.  Notwithstanding the difference, Hernandez must still establish that Grigson's and Erdmann's testimonies were false and material.  *See* **Fuller v. Johnson**, 114 F.3d 491, 497 (5th Cir. 1997) (holding that habeas prisoner's Eighth Amendment claim failed because he had not adequately shown that Erdmann's testimony was false or material).

Although neither the Supreme Court nor this circuit has defined "materially" in the context of an Eighth Amendment violation under **Johnson**, the Supreme Court has had occasion to elaborate on materiality in the analogous context of the government's suppression of material evidence under **Brady v. Maryland**, 83 S. Ct. 1194 (1963).  *See* **Kyles v. Whitley**, 115 S. Ct. 1555 (1995).  In **Kyles**, it noted that the touchstone of materiality is a "reasonable probability" of a different result.  *See id*. at 1566; **United States v. O'Keefe**, 128 F.3d 885, 894 (5th Cir. 1997).  Under such a standard, Hernandez must show that Grigson's and Erdmann's testimonies undermined confidence in the outcome of the trial.  *See* **Kyles**, 115 S. Ct. at 1566; *see also* **O'Keefe**, 128 F.3d at 894 ("Materiality, stated another way, occurs when the falsehood results in a 'corruption of the truth-seeking function of the trial process.'") (quoting **United States v. Agurs**, 96 S. Ct. 2392, 2397 (1976)).

18

With those pronouncements in mind, we address the allegations about Grigson and Erdmann in turn. Again, we reiterate that we must give due deference to the state habeas court's findings and presume them to be correct. Although the state habeas court termed some of its findings regarding Grigson's and Erdmann's testimonies as conclusions of law, it did clearly state that there was no credible evidence to support Hernandez' Eighth Amendment claim.

A review of Grigson's testimony and Hernandez' proffered evidence does not dissuade us from the state habeas court's view. At most, Grigson may have falsely testified to the number of defendants whom he interviewed and determined not to be dangerous,[2] but any discrepancy in that testimony does not arise to the level of materiality required for an Eighth Amendment violation. "It is axiomatic that not every lie is material." *O'Keefe*, 128 F.3d at 894. Hernandez essentially quibbles over the number of cases Grigson may have examined to argue that Grigson has no credibility and that Grigson's future dangerousness prediction has no foundation. During the trial, however, Hernandez had the opportunity to do just that. He offered five experts who testified that future dangerousness predictions are inaccurate, and one of them testified that Grigson had been wrong on at least 15

---

[2]After being impeached by Hernandez' trial counsel as being biased in favor of the State, Grigson testified that he had interviewed "tens" of defendants whom he deemed not to be dangerous.

19

occasions. Thus, Grigson's credibility was severely tested, and whether he may have falsely stated the number of defendants whom he examined and concluded to be not dangerous was immaterial to the result. Indeed, the future dangerousness of Hernandez was, in many ways, more adeptly established by evidence indicating that Hernandez had: 1) five prior felony convictions; 2) assaulted his wife and daughter; 3) disciplinary problems during prior prison terms; 4) encouraged his son to kill the son's maternal grandfather; 5) assaulted his four- and five-year-old relatives; 6) repeatedly stabbed a person with a knife; 7) assaulted a fellow inmate while in county jail awaiting trial in this case; and 8) made threats of killing a trial judge in this case. In light of all those facts, we conclude that, even if Grigson had testified falsely, his testimony was not material and that, therefore, Hernandez has failed to substantially show the denial of a constitutional right.

Similarly, Hernandez' contention regarding Erdmann must also fail. Hernandez argues that Erdmann did not actually inspect Alvarado's heart and, thus, could not have truthfully testified that Alvarado did not die of a heart attack. He bases that claim on a statement by Erdmann that Alvarado's "new implants were in good shape" and on the fact that no Y-incision to the thoracic area appears to have been made despite Erdmann's testimony to the contrary. Although the portions of Erdmann's testimony referred to by Hernandez suggest that Erdmann testified to examining the heart,

20

there is no affirmative declaration by Erdmann that he did do such an examination.  Even if we did conclude that Erdmann had testified as such and that other evidence, such as the autopsy photo of the body without a Y-incision, corroborates Erdmann's lack of truthfulness as to inspecting Alvarado's heart, those conclusions do not establish the falsity of Erdmann's analysis that Alvarado did not die from a heart attack.  His determination that a heart attack did not cause Alvarado's death was not necessarily dependent on an examination of the heart.  The failure to inspect the heart does not negate Erdmann's belief that blows from a blunt object caused Alvarado's death.

At best, Hernandez has demonstrated that Erdmann lied about inspecting Alvarado's heart.  We do not believe that such an inaccuracy is material, considering that Hernandez has neither asserted nor shown that Erdmann's testimony about the cause of death was actually false.  *See Fuller*, 114 F.3d at 496.  Take out any testimony remotely discussing an examination of Alvarado's heart, and we are still left with testimony stating that blows by a blunt object, like a baseball bat, killed Alvarado and that a heart attack did not cause her death.[3]

Finally, even assuming all of Hernandez' argument about

---

[3]Rather than focusing on Erdmann's perceived false testimony to challenge his blanket statement that a heart attack did not cause Alvarado's death, Hernandez should have challenged on re-cross the methods by which Erdmann reached that conclusion.  *See Fuller*, 114 F.3d at 496-97.

Erdmann's testimony is true, we must still defer to the state habeas court's finding that the State presented credible evidence from two additional pathologists that Erdmann had been correct in his assessment of the manner and cause of death. Hernandez has not rebutted that finding, and we must presume that it is correct.

Consequently, we conclude that Erdmann's testimony about Alvarado's heart was not material and that, therefore, Hernandez has failed to substantially show the denial of a constitutional right.

## III. CONCLUSION

Because Hernandez has failed to make a substantial showing of the denial of a constitutional right with respect to both issues raised in his application for a COA, his application is DENIED.