# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 26, 2025

Lyle W. Cayce
Clerk

No. 24-70008

Irving Alvin Davis,

*Petitioner—Appellant*,

*versus*

Eric Guerrero, *Director,*
*Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee.*

Application for Certificate of Appealability
from the United States District Court
for the Western District of Texas
USDC No. 3:14-CV-121

Before Smith, Graves, and Engelhardt, *Circuit Judges.*
Per Curiam:[*]

Irving Davis applies for a certificate of appealability ("COA") on two habeas corpus claims challenging his death sentence. We do not decide the merits, but we conclude that he has made the threshold showing for issuance of a COA on both claims.

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

I.

Davis was convicted and sentenced to death in 2002 for murdering 15-year-old Melissa Medina in the course of committing or attempting to commit aggravated sexual assault. *Davis v. State*, 329 S.W.3d 798, 802 (Tex. Crim. App. 2010). The Texas Court of Criminal Appeals ("CCA") affirmed Davis's conviction but reversed the sentence of death and remanded for a new punishment trial. *Id.* (citing *Davis v. State*, No. AP-74,393, 2007 WL 1704071 (Tex. Crim. App. June 13, 2007)). At the punishment retrial in 2008, the court again sentenced Davis to death in accordance with the jury's answers to the "two special issues submitted under Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e)."[1] The jury "determined (1) Davis was a continuing threat to society and (2) there were insufficient mitigating circumstances to warrant a sentence of life in prison without parole."[2] *Id.* The CCA affirmed Davis's 2008 sentence on direct appeal and denied his applications for habeas relief.[3]

Davis also filed a federal habeas petition raising several claims; the district court denied relief on all of them. The district court also denied Davis a COA, which he now asks us to grant as to two claims: (1) Evidence of Davis's conversion to Satanism admitted at his punishment retrial violated the Constitution; and (2) Davis's retrial counsel rendered constitutionally deficient performance.

II.

"'Before an appeal may be entertained,' a habeas petitioner 'must

---

[1] *Davis v. Lumpkin*, 2023 WL 5986474, at *17 (W.D. Tex. Sept. 13, 2023).

[2] *Id.*

[3] *See Davis v. State*, 329 S.W.3d 798; *Ex parte Davis*, Nos. WR-61,445-01, WR-61,445-02, 2014 WL 969802 (Tex. Crim. App. Mar. 12, 2014); *Ex parte Davis*, No. WR-61,445-03, 2020 WL 1645017 (Tex. Crim. App. Apr. 1, 2020).

first seek and obtain a COA' as a 'jurisdictional prerequisite.'" *Raby v. Davis*, 907 F.3d 880, 883 (5th Cir. 2018) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003)). A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet that standard, the petitioner must "demonstrate[] that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." [4] *Raby*, 907 F.3d at 883 (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)). "In determining whether a COA should issue, we view the petitioner's arguments through the lens of the deferential scheme laid out in" the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Escamilla v. Stephens*, 749 F.3d 380, 387 (5th Cir. 2014) (quotation omitted).

The AEDPA permits relitigation of claims adjudicated on the merits in state court only if the petitioner demonstrates that the state's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Section 2254(e)(1) provides that petitioners "shall have the burden of rebutting the presumption of correctness" of a state court's "determination of a factual issue" "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). [5]

---

[4] *Id.* (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)).

[5] *See Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023) (explaining the AEDPA standards governing claims presenting questions of law, fact, and a mix of law and fact).

The COA stage "does not require full consideration" of the merits. *Miller-El*, 537 U.S. at 336. "In fact, the statute forbids it." *Id.* "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. And "[t]he COA standard is less burdensome in capital cases, as 'in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor.'" *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020) (quoting *Clark v. Thaler*, 673 F.3d 410, 425 (5th Cir. 2012)).

III.

Davis first applies for a COA on his claim that his constitutional rights were violated at the punishment retrial by the admission of evidence that Davis had converted to Satanism. According to Davis, that evidence violated his First Amendment rights to freedom of religion and association and ran afoul of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Davis principally contends that the admission of the evidence of Satanism was improper under *Dawson v. Delaware*, 503 U.S. 159 (1992). There, the Court held that admission of evidence of a defendant's membership in the Aryan Brotherhood violated the First Amendment because it was "totally without relevance to Dawson's sentencing proceeding" and "proved nothing more than [his] abstract beliefs." *Id.* at 165–67. That indicated that the "evidence was employed simply because the jury would find [Dawson's] beliefs morally reprehensible." *Id.* at 167. Still, the Court "conclude[d] that the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165. The Court explained,

> In many cases, for example, associational evidence might serve

a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. Other evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances.

*Id.* at 166.

The district court recounted the state procedural history relevant to the Satanism claims. 2023 WL 5986474, at *54–55. On direct appeal from his second trial, Davis alleged that the admission of the Satanism evidence violated the First Amendment and Texas's rules of evidence. *Davis*, 329 S.W.3d at 802–03. The CCA applied *Dawson*, holding that "evidence concerning one's beliefs and associations . . . may be admissible if it is shown to be relevant to the issues involved in the case." *Id.* at 805 (citing *Mason v. State*, 905 S.W.2d 570, 576–77 (Tex. Crim. App. 1995)). The CCA held that "a defendant's membership in an organization or group" is sufficiently relevant to the issue of future dangerousness if the state shows "(1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Id.* (citing *Mason*, 905 S.W.2d at 577 (*Dawson*, 503 U.S. at 163–67)).

The CCA applied the second prong of that standard by pointing to evidence from prison records demonstrating that Davis "had identified himself as a Satanist since 2005." *Id.* Next, the court held that the first prong was satisfied because "[the state's expert, Donald Vaughn] Haley, testified that some members of the Satanic religion advocate violence, that Satanic religious publications like the ones found in [Davis's] cell discussed 'rituals of destruction' for performing 'human sacrifice' on 'undesirable [and] obnoxious individual[s],' and that various people had committed murder and mutilation 'in the name of Satan.'" *Id.* And "[a]lthough [Davis's expert

5

John Gordon] Melton, disagreed with Haley's definition of the term 'destroy' and his description of Satanic philosophy, Melton acknowledged that in some instances people had been killed in the name of Satanism." *Id.* On that basis, the CCA held that "[i]t was within the zone of reasonable disagreement for the trial court to decide that the evidence of Satanism was relevant to the issue of future dangerousness and outside the protection of the First Amendment." *Id.* at 805–06 (applying Texas's abuse-of-discretion standard of review for the admission of evidence).

After the denial of relief on direct appeal, Davis filed a state habeas petition raising the Satanism issue. The CCA adopted the trial court's conclusions that (1) the Satanism claim was not cognizable in a state habeas proceeding because it was already rejected on direct appeal; (2) the claim failed on the merits for essentially the reasons the CCA elucidated on direct appeal; and (3) Davis failed to demonstrate harm from any error "because it is more likely than not that the outcome of [Davis's] punishment phase would have been the same without the complained-of evidence." *See Ex parte Davis*, 2014 WL 969802, at *1 (adopting these conclusions).

The district court held that the CCA had reasonably rejected Davis's claim that the admission of the Satanism evidence violated his constitutional rights under *Dawson*. 2023 WL 5986474, at *55–57. The court concluded,

> [I]n contrast with *Dawson*—the State combined evidence of Davis's Church of Satan involvement, Haley's literalist reading of *The Satanic Bible*, and Melton's concession that people had been killed in the name of Satanism to show that Satanism encouraged its adherents to engage in violence against those who they believed had wronged them. Hence, the State presented evidence which was relevant to Davis's future dangerousness. Moreover, considering this evidence, the Court of Criminal Appeals applied *Dawson* and reasonably found that there was no First Amendment violation.

6

*Id.* at *56.

Next, the district court held that, even assuming the CCA was wrong, Davis could not establish actual prejudice under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). First, Davis had the opportunity to cross-examine the state's Satanism expert and to rebut that testimony with his own testimony and that of his expert. 2023 WL 5986474, at *56. Second, "Davis faced an insurmountable sum of aggravating evidence," so even if the Satanism evidence were not admitted, "the jury could reasonably conclude there was a probability that Davis would commit future criminal acts of violence that would constitute a continuing threat to society." *Id.*

The district court subsequently denied Davis's motion to alter or amend the judgment as to the Satanism claims.

A.

Davis avers that the state failed to prove the relevance of the Satanism evidence because it did not establish that the Church of Satan itself committed or endorsed violent or illegal acts. He contends that the state proved only that "some" people have committed violence in the name of Satan, and he avers that the Church of Satan officially opposes violence. The state responds that *Dawson* does not require that the group *itself* have committed or endorsed violence—only that such facts were missing from *Dawson*'s case and that the contested evidence in that case was not otherwise relevant.[6] The state contends that the Satanism evidence passes muster under *Dawson* because it was "relevant to future dangerousness."

---

[6] *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." (quotation omitted)).

*Dawson* unequivocally held that evidence of beliefs or association must be relevant to the issues in the case for its admission to be permissible. Reasonable jurists would debate whether the CCA's application of that test was objectively unreasonable. The CCA concluded that evidence of Davis's Satanism was relevant because the state had shown "proof of the group's violent and illegal activities." *Davis*, 329 S.W.3d at 805. But as proof of the "group's" violence, the CCA relied merely on (1) evidence that "some" or "various" people in some unidentified sect of Satanism have advocated or committed violence and (2) disputed testimony about whether certain Satanic literature encourages violence. *Id.* at 805–06.

Reasonable jurists would debate whether it is objectively unreasonable to find Davis's group membership relevant based on that analysis. First, the beliefs and actions of "some" or "various" members of a group do not necessarily show that someone who associates with that group shares those beliefs or actions. For example, a few members of a group could commit violence in the name of that group while the vast majority of members denounce those actions. The CCA's reasoning could permit associational guilt even under those circumstances as long as "various"—*i.e.* an undefined fraction—of group members are violent.

Second, it is debatable whether the CCA's reliance on disputed testimony about Satanic texts renders the evidence relevant. The CCA did not hold that the Satanic literature endorsed violence; it was enough that there was disputed expert testimony concerning its meaning. *Id.*[7] Reasonable jurists would debate whether that evidence is enough to prove the relevance of Davis's identification as a Satanist.[8]

---

[7] Davis also suggests that Haley's testimony is unreliable because he was not well qualified as an expert in Satanism.

[8] The state suggests that Davis's violent drawings, admitted as part of the Satanism

The debatability of both points is underscored by the fact that the CCA did not determine whether attitudes toward violence vary across the different sects of Satanism discussed in the trial testimony—and, if so, to which sect Davis belonged. That is significant because *Dawson* explained that evidence of one sect's beliefs does not necessarily demonstrate what another sect believes. There, the evidence "sa[id] nothing about the beliefs of the Aryan Brotherhood 'chapter' in the Delaware prisons" but the prosecution "invited the jury to infer that the beliefs of the Delaware chapter are identical to those of the California chapter." *Dawson*, 503 U.S. at 165–66. It is debatable whether the CCA unreasonably applied *Dawson* by failing to require evidence that Davis's branch of Satanism advocated violence.

In sum, an objectively reasonable application of *Dawson* requires that the evidence be relevant to an issue in the case. Reasonable jurists would debate the district court's deference to the CCA's determination that the Satanism evidence was relevant to Davis's future dangerousness; it is debatable whether "the [Satanism] evidence was employed simply because the jury would find these beliefs morally reprehensible." *Id.* at 167.

B.

For a COA to issue, it is not enough that reasonable jurists could debate the district court's AEDPA deference; the district court's conclusion that any trial error was harmless must also be debatable. A habeas petitioner must show that the constitutional error "resulted in actual prejudice"—that is, that "the error had substantial and injurious effect or influence in deter-

---

evidence, also help show that evidence of his Satanism was relevant to future dangerousness. But because the CCA did not rely on the drawings to reach its constitutional holding, a federal court cannot rely on that reasoning in its AEDPA-deference analysis. *See Wooten v. Lumpkin*, 113 F.4th 560, 566–67 (5th Cir. 2024) (holding that *Wilson v. Sellers*, 584 U.S. 122 (2018), abrogated our contrary conclusion in *Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (en banc)).

mining the jury's verdict." *Brecht*, 507 U.S. at 637 (quotations omitted).

The parties offer starkly different framings of how large a role the Satanism evidence played in Davis's second trial. As Davis tells it, "the prosecution devoted more than a third of its testimony (other than that offered to prove the crime itself) to establishing that Davis was a Satanist." And, Davis says, the prosecution suggested the jury could rely on his Satanism to find future dangerousness if that is "enough for you." The state counters that the Satanism evidence "was a small part of the overall proceedings," and the prosecution asked the jury to find that Davis is a future danger, not based on his artwork or Satanism, but based on *all* the evidence. The state cites the state habeas court's findings that Davis's Satanism was not part of the state's opening statements; that the Satanism expert testimony spanned only 77 pages; and that the state's Satanism expert was only one of its approximately 30 witnesses and came neither first nor last.

The district court held that the Satanism evidence was harmless under *Brecht* even if its admission violated the First Amendment because Davis (1) cross-examined the state's Satanism expert; (2) presented rebuttal testimony through his own expert; (3) had the opportunity to testify that the Church of Satan does not advocate violence; and (4) "faced an insurmountable sum of aggravating evidence" that "he sexually assaulted, murdered, and dismembered 15-year-old Medina." 2023 WL 5986474, at *56.

Just because Davis was allowed to present rebuttal testimony does not mean he effectively neutralized the potential prejudice. Moreover, the aggravating facts of the crime itself might—as the district court concluded—be enough evidence that "the jury *could reasonably conclude* there was a probability that Davis would commit future criminal acts of violence that would constitute a continuing threat to society." *Id.* (emphasis added). But the standard for harmless error is not whether the evidence was *sufficient* for the

jury to reach its verdict. Instead, the query is whether the erroneously admitted evidence had a "substantial and injurious effect or influence" on the verdict. *Brecht*, 507 U.S. at 637 (quotation omitted). Reasonable jurists could debate whether the evidence of Satanism had enough of an influence on the jury that—despite the other aggravating evidence—the error was not harmless under *Brecht*.

To be sure, there are other aggravating factors that support a finding of future dangerousness. For example, Davis's violent writings and drawings, admitted as part of the Satanism evidence, would likely have been admissible in their own right even if Davis's Satanic affiliation were irrelevant, because they "exhibit[ed] a preoccupation with rape, violence (particularly towards women), and death."[9] Further, the state habeas court found that there was "evidence of multiple acts of past misconduct and violence at [Davis's] punishment retrial" and that "[Davis's] confession and testimony that he killed [Medina] because he was either afraid or angry that she would report the rape demonstrates the likelihood that he would resort to violence to escape the consequences of his misconduct."[10]

Nevertheless, we cannot say that no reasonable jurist would debate whether Davis failed to show actual prejudice.[11] First, the evidence of

---

[9] The related question of whether those drawings rendered evidence of Satanic *affiliation* admissible under *Dawson* is debatable among jurists of reason. *Cf. supra* note 8; *see Wooten*, 113 F.4th at 567 ("In a case where the state court reaches the correct result, but provides inadequate reasons, habeas relief will be inappropriate because the error in reasoning will be harmless under *Brecht*.").

[10] Davis characterizes his past misconduct as "minor childhood transgressions like shoplifting, smoking marijuana, and passing through school grounds while suspended." But the state habeas court findings demonstrate there was also testimony that people had observed Davis throwing "a bar stool in anger at a dance club" and chasing his brother "around the house with a big kitchen knife and pin[ning] him on the ground with that knife."

[11] Although a state habeas court has concluded that any Satanism error was "more

Satanic affiliation might have been so inflammatory and odious to the jury that it drove the conclusion on future dangerousness. The prosecution arguably suggested to the jury that it could rely on Davis's Satanism if that is "enough for you." At least as importantly, the jury also might have been influenced by the inflammatory evidence in considering other issues, such as whether mitigating circumstances were present. The only question we address is whether any reasonable jurist would debate the district court's resolution and, mindful that we resolve doubts in favor of a capital defendant at the COA stage, we determine that question in the affirmative.[12]

We grant Davis's motion for a COA on his Satanism claims.[13]

## IV.

Davis next asserts an ineffective assistance of counsel claim per *Strickland v. Washington*, 466 U.S. 668 (1984). The state habeas court applied *Washington* and held that Davis was not entitled to relief because he could demonstrate neither deficient performance nor prejudice. *See Ex parte Davis*, 2014 WL 969802 at *1 (adopting the trial court's findings and conclusions

---

likely than not" harmless, Davis need only show that the district court's *Brecht* holding is debatable; he does not need to show that the state court's conclusion was unreasonable. That is because the state court applied a more-likely-than-not harmlessness standard rather than the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California*, 386 U.S. 18 (1967). *See Brown v. Davenport*, 596 U.S. 118, 135 (2022) ("When a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable.").

[12] "The COA standard is less burdensome in capital cases, as 'in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor.'" *Nelson*, 952 F.3d at 658 (quoting *Clark*, 673 F.3d at 425).

[13] Davis avers that neither the state courts nor the district court has addressed his claims that the Satanism evidence violates the Eighth Amendment and due process. He thus asks us to remand those claims for consideration in the first instance. We decline to remand because Davis does not make any developed argument that those claims are not encompassed within his *Dawson* claim.

and denying relief).  The district court deferred to the state court's application of *Washington* under the AEDPA and denied Davis's petition. 2023 WL 5986474, at *47–49.

To prevail on a *Washington* claim, a petitioner must "show both that his counsel provided deficient assistance and that there was prejudice as a result." *Richter*, 562 U.S. at 104.  Deficient performance occurs when "counsel's representation fell below an objective standard of reasonableness." *Washington*, 466 U.S. at 688.  Prejudice requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Further, the AEDPA creates a "doubly" deferential standard: courts afford deference not only to counsel's decisions but also to state court applications of *Washington*. *Richter*, 562 U.S. at 105.  "The pivotal question [for AEDPA deference] is whether the state court's application of the [*Washington*] standard was unreasonable." *Id.* at 101.  "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Davis avers that his counsel rendered deficient performance at his punishment retrial by (1) failing to appoint an investigator and mental health expert until the eve of voir dire—and never appointing a mitigation expert at all; (2) failing to investigate and keep in touch with Davis between his first and second trials; (3) failing to conduct an investigation or speak to family members until just before trial; and (4) failing to follow up on numerous "red flags" that would have caused competent counsel to investigate further.

13

Davis asserts that he suffered prejudice because there is a reasonable probability that the outcome of his trial would have been different if the jury had been apprised of certain mitigating evidence. Specifically, Davis alleges several categories of omitted mitigating evidence: (1) a history of mental, physical, and sexual abuse by his father and family "friends"; (2) a history of depression, self-mutilation, and suicide attempts; (3) sexual abuse of Davis's brother by Davis's father; (4) a history of parental neglect, abandonment, and alcoholism; (5) childhood protective services ("CPS") involvement with Davis's family; and (6) Davis's father's criminal history.

We conclude that the district court's decision is debatable among jurists of reason.

## A.

First, reasonable jurists would debate whether the state habeas court unreasonably applied *Washington* in concluding that Davis could not show deficient performance. The state court made several factual findings that the "red flags" Davis cites would not have turned up credible mitigation evidence. But at least one category of those factual findings is debatably clearly erroneous: that the allegations of Davis's suicide attempts and self-mutilation are "not credible." Reasonable jurists would debate whether that finding is clearly erroneous because the state court credited testimony that, "during his pretrial investigation, [Davis's counsel] learned that [he] had previously engaged in the practice of self-mutilation ('cutting') and had attempted suicide." Further, the state court noted that Davis's "jail medical records contained notations that he had complained about wanting to commit suicide and had admitted to four prior suicide attempts," and those records "reflect that [Davis] received treatment for depression while incarcerated." Prison records filed in the state trial court also indicate that Davis had "[c]igarette [b]urns and knife cuts on [his] left forearm." And Davis had reported

a "history of depression and visual hallucinations" to Dr. James Schutte, the defense's mental health expert. Those facts debatably undercut the state habeas court's factual findings that Davis's mental health and suicide allegations were not credible.

Davis's counsel debatably fell below an objectively reasonable standard of performance by failing to investigate and present evidence when there were "red flags" indicating a history of mental health struggles. *Washington* and its progeny "require[] counsel to reasonably pursue investigation of available leads, regardless of a client's obstructive behavior or concealment of evidence." *Escamilla*, 749 F.3d at 392. Davis's counsel had information available to them that suggested that additional mitigating evidence might have been uncovered with further investigation; their failure to develop and present that evidence was debatably unreasonable.[14]

The state court found that trial counsel did not perform deficiently, in part because their strategy was to present a mitigation defense focused on "personal accountability" and "humanizing" Davis to the jury "so that they would find it more difficult to impose a sentence of death." The court further found that "[Davis's] decision to take the stand and ask that the jury impose a sentence of death affected how [counsel] would pursue their defensive strategy of personal accountability and of humanizing [Davis]."

Reasonable jurists would debate whether that conclusion is unreasonable because "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Washington*, 466 U.S. at 690–91.

---

[14] *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) ("Counsel thus failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service. The decision not to investigate did not reflect reasonable professional judgment." (citing *Wiggins v. Smith*, 589 U.S. 510, 534 (2003))).

Davis's counsel testified at the state habeas hearing that they "didn't always know whether [Davis] was going to get up on the stand" and that he did not decide to testify until the "particular day" of, or "the night before." Thus, any strategy that turned on Davis's potential testimony did not relieve counsel of their duty to conduct an adequate mitigation investigation *before* the trial. "[I]f a purportedly tactical decision is not preceded by a reasonable investigation, then it is not sufficiently informed and not entitled to the deference typically afforded counsel's choices." *Escamilla*, 749 F.3d at 392 (citing *Sears v. Upton*, 561 U.S. 945, 954 (2010)).

Moreover, mitigating evidence of abuse and suicidality would not necessarily be inconsistent with a mitigation defense focused on personal accountability.[15] Indeed, the state habeas court acknowledged that some evidence of Davis's abusive childhood *was* presented to the jury. That could indicate that counsel's "'strategic decision' . . . resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Wiggins*, 539 U.S. at 526–27. "Reasonable jurists could debate whether in concluding that counsel's mitigation investigation amounted to effective representation, the state habeas court unreasonably applied [*Washington*] and its progeny, which requires counsel to reasonably pursue investigation of available leads, regardless of a client's obstructive behavior or concealment of evidence." *Escamilla*, 749 F.3d at 392.

## B.

Reasonable jurists would also debate whether the state habeas court unreasonably applied *Washington*'s prejudice prong. Davis asserts that he

---

[15] *Contra* 2023 WL 5986474, at *48 ("Trying to explain his actions as the product of a horrific childhood and dysfunctional family—thereby diverting attention away from personal responsibility—would have undermined what Davis hoped to achieve at trial.").

suffered prejudice because there is a reasonable probability that the outcome of his trial would have been different if the jury had been apprised of certain mitigating evidence. Again, the state court made numerous factual findings that the district court assessed through the AEDPA's deferential lens.

The factual findings relating to Davis's alleged suicide attempts and torturous mental health history again stand out because they are debatably clearly erroneous. *See supra* part IV.A. To the extent that the state court's no-prejudice conclusions are based on clearly erroneous findings, they are debatably based on an unreasonable determination of the facts, and they debatably constitute an unreasonable application of *Washington*. *Neal*, 78 F.4th at 783.

For the reasons discussed in part IV.A., the state court's "not credible" determination as to Davis's suicide and self-mutilation allegations is debatably clearly erroneous. That debatably undermines the state court's holding that "[t]he record does not affirmatively demonstrate a reasonable probability that the complained-of omitted mitigation evidence would have tipped the scale in [Davis's] favor."

It is true that the state court gave additional reasons for its no-prejudice conclusion. For example, the court reasoned that there was "extensive evidence in aggravation of death," such as the "brutal facts" of the crime itself, Davis's "disciplinary and criminal history," his violent writings and drawings, and his conversion to Satanism. But had the court determined the mental health facts in a different way, it might have weighed the mitigating facts differently against the aggravating ones.[16]

---

[16] *See Escamilla*, 749 F.3d at 390 (citation omitted) ("[W]hen conducting a prejudice analysis under [*Washington*] in the capital sentencing context, a habeas court must consider the totality of all mitigation evidence . . . and reweigh it against the aggravating evidence . . . ."). We also note that the propriety of the state court's reliance on Davis's

Perhaps more importantly, Davis's suicide and mental health allegations combine arguments from two claims in state court, and the state court cited those aggravating factors only as to *one* of the claims.[17]  For its no-prejudice finding on the *other* claim, the state court relied more heavily on its (debatably erroneous) findings that Davis did not credibly allege self-mutilation and suicide attempts.  The state court also relied on a finding that "the jury was privy to evidence of the . . . alleged suicide attempts."  Perhaps the jail medical records containing Davis's allegation were admitted into evidence, but a search of the trial transcript indicates that the trial testimony did not reveal any evidence of Davis's alleged suicide attempts.[18]

The AEDPA requires us to look to the state court's reasoning—not just its conclusion—when deciding whether a petitioner clears § 2254(d)'s relitigation bar.  *Wooten*, 113 F.4th at 566–67.  Reasonable jurists would debate whether the state court's no-prejudice conclusions are correct based on its findings and reasoning.

The state responds that there is no debatable prejudice here because, in addition to the brutality of the crime and the weakness of Davis's mitigating evidence, Davis asked the jury to sentence him to death.  Thus, the

---

Satanism is debatable.  *See supra* part III.

[17] Davis's federal habeas claim—that his attorneys were ineffective for failing to investigate and present mitigation evidence of Davis's abusive and dysfunctional family life—is phrased virtually identically to his "ground two" claim in the state habeas court.  Davis's arguments in federal court, however, incorporate many assertions from his "ground three" state-court claim, which alleged ineffective assistance for failure to obtain and present expert mitigation testimony about the psychological implications of, *inter alia*, Davis's depression, self-mutilation, and suicide attempts.

[18] Indeed, the jury might have been given the impression that Davis had not attempted suicide because the state's future-dangerousness expert was asked to opine on a hypothetical person with Davis's characteristics who, among other things, "does not ever attempt suicide."

state avers that this case is like *Luna v. Lumpkin*, 832 F. App'x 849 (5th Cir. 2020), and *Schriro v. Landrigan*, 550 U.S. 465 (2007), where courts rejected ineffective-assistance claims after the petitioner had asked the jury to render the death penalty. But as Davis notes, reasonable jurists would debate whether this case is distinguishable from *Luna* and *Landrigan*. In *Luna*, the petitioner testified to the jury that there was *zero* mitigating evidence whatsoever; in *Landrigan*, the petitioner had specifically instructed his counsel not to offer *any* mitigating evidence. *See Luna*, 832 F. App'x at 851; *Landrigan*, 550 U.S. at 475–76. And even in *Luna*, we granted a COA on the petitioner's ineffective-assistance claim before denying relief on appeal. *See Luna v. Davis*, 793 F. App'x 229 (5th Cir. 2019) (per curiam). Here, as in *Luna*, reasonable jurists would debate the district court's AEDPA deference to the state court's application of *Washington*.

We grant Davis's motion for a COA on his claim of ineffective assistance of counsel.

\*   \*   \*   \*   \*

Davis has made a threshold showing that reasonable jurists would find the district court's resolution of his Satanism and ineffective-assistance claims debatable. We note that it will not be enough on appeal for Davis to show that AEDPA deference was improper. Once he clears AEDPA's relitigation bar, he will need to make a *de novo* showing that he is entitled to habeas relief. *See Langley v. Prince*, 926 F.3d 145, 156 (5th Cir. 2019) (en banc). Because reasonable jurists would debate whether Davis can make those showings, we GRANT a COA for Davis's Satanism and ineffective-assistance claims. We reserve judgment on the merits of those claims until they have been briefed and submitted.